IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT L. WATKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:10CV491-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

Plaintiff Robert L. Watkins brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## PROCEDURAL HISTORY

On September 13, 2005, plaintiff filed an application for supplemental security income, alleging disability since June 1, 2000, due to mental illness. On June 17, 2009, after the claim was denied initially and on reconsideration, an ALJ conducted an administrative hearing. The ALJ rendered a decision on July 16, 2009. The ALJ concluded that plaintiff suffered from the severe impairments of "Malingering, with invalid IQ scores; History of

polysubstance dependence; Bipolar Disorder vs. anxiety attacks; borderline intellectual functioning; Anti-social Personality Disorder; and Hepatitis C." (R. 26). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings"; that plaintiff had no past relevant work; and that he retained the residual functional capacity to perform jobs existing in significant numbers in the national economy, including the representative jobs of cleaner, hand packer, and grounds keeper. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. (R. 24-40). On March 26, 2010, the Appeals Council granted plaintiff's request for review, finding that the ALJ had failed to address the opinions of two consultative examiners properly. (R. 296-99). On May 14, 2010, the Appeals Council issued a decision adopting the findings of the ALJ and assigning "little weight" to the two examining source opinions. Plaintiff appeals from this final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the Commissioner's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d

at 1145.  Factual findings that are supported by substantial evidence must be upheld by the court.  The Commissioner's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the Commissioner's application of the law, or if the Commissioner fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the Commissioner's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## BACKGROUND[1]

In June of 2000, apparently in connection with an earlier SSI application in Minnesota, plaintiff was examined by psychologist Robert C. Barron, Ph.D. (Exhibit 1F).  Plaintiff was applying for disability "on the basis of back pain, as well as cognitive and emotional problems."  Plaintiff "walked with a slow gait" and "sat hunched over, periodically straightening up clutching at his back while wincing and grunting as though experiencing significant subjective discomfort."  He reported that he "broke his vertebrae"[2] a few years previously loading chickens and has constant back pain.  He further reported both auditory and visual hallucinations and he told Dr. Barron that "his skull was cracked when he fell off

---

[1]  In his brief, plaintiff does not challenge the physical exertion aspect of the Commissioner's RFC finding.  Instead, his argument is directed to the Appeals Council's treatment of the medical source opinions regarding his mental limitations.

[2]  X-rays conducted in 2008 showed mild degenerative changes in plaintiff's cervical spine and a "severely desiccated disc at L4-L5."  (R. 285).

a truck onto a pavement a number of years ago,"[3] causing problems with thinking, learning, and memory.  Dr. Barron noted that plaintiff's "[s]peech and language development were impoverished and he was prone to respond in a slow, mumbling manner while being an extremely vague historian," and that his "[a]ffective reactions were subdued with sad fac[]es and overall mood appeared to be dysphoric."

Plaintiff reported that he bathed and changed clothes every other day when reminded to do so, did not cook or perform household chores, and did not drive or take public transportation.  He stated that "if he took the bus, they would have to call police in the state because he would become nervous and angry and assault someone."  He reported that he was able to shop only with someone else and that he could sometimes make selections but not purchases, and that he does not know how to manage finances.  He stated that he watches television in his spare time but "someone needs to explain the plot to him," and that he "doesn't read, but thinks he knows how to do so."  Dr. Barron interviewed plaintiff's "significant other," who confirmed plaintiff's reports.  Dr. Barron administered the Wechsler Adult Intelligence Scale - III, resulting in a Verbal IQ score of 62, Performance IQ score of 54, and Full Scale IQ score of 54.  Dr. Barron concluded that these scores were valid, and he diagnosed "[d]ementia due to head trauma, by report" on Axis I, and "[h]ead injury, by report" on Axis III.  He also rendered a "[p]rovisional [d]iagnosis of schizophrenia" on Axis II. Dr. Barron determined that "[o]n the basis of client's cognitive, social, and emotional functioning, it would not appear that he would be capable of communicating,

---

[3]  The only evidence in the present record regarding a cracked skull is by plaintiff's report.  The transcript includes no medical documentation of this injury.

comprehending, and retaining simple directions, withstanding work stresses, meeting production requirements, or relating to others at an unskilled, competitive employment level." (R. 167-71). On July 11, 2000, R. Owen Nelson, Ph.D. – a non-examining psychologist – concluded, based on Dr. Barron's report, that plaintiff met Listing 12.02 for organic mental disorders.[4] (Exhibit 2F, R. 172-80).[5]

In January 2001, plaintiff sought treatment at the Hennepin County Medical Center in Minneapolis for coughing and congestion.  He also reported "bad nerves," complaining that he thinks someone is behind him and that his life is being threatened.  He stated that he has never seen a psychiatrist, that he lived in St. Paul with his girlfriend of 15 years, and that his social life was "ok."  (R. 197).  The medical provider diagnosed paranoia, not otherwise specified, and upper respiratory infection, and referred plaintiff for psychological evaluation. (R. 198).  A psychiatrist evaluated plaintiff on August 10, 2001.  Plaintiff reported a feeling of fear that someone was behind him and that people were going to harm him.  He stated that

---

[4] This Listing applies where the "[h]istory and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities."  20 C.F.R. Pt. 404, Subpt. P, ¶ 12.02.

[5] At some point thereafter, plaintiff was incarcerated in Minnesota. (R. 188).  A Minnesota attorney previously representing the plaintiff stated, in a letter to the ODAR in Minneapolis and in a later letter to the ALJ, that plaintiff had told the attorney that he was receiving SSI benefits previously but that his benefits were suspended due to an outstanding Alabama warrant. The attorney enclosed paperwork showing that an indictment issued on April 6, 2001, for two counts of unlawful distribution of cocaine, and that the charges were "nolle prossed" by the Alabama Circuit Court on the prosecution's motion in September 2005. (R. 150-58). The attorney requests a favorable determination on the basis of the Circuit Court record, contending that the "only issue should be whether the ongoing suspension of his benefits by SSA is valid." (R. 150). However, the matter before the Commissioner – on which he rendered the decision now before this court for review – was the new claim for SSI benefits filed by plaintiff in 2005 (see R. 95-113), not an appeal of a discontinuation or suspension of benefits. (See R. 69, letter from SSA attorney to plaintiff's previous attorney). Plaintiff's present counsel does not argue otherwise.

he "hears people calling his name," but reported no other hallucinations. He reported a remote history of IV drug use and use of marijuana.[6]

The psychiatrist recorded, in the mental status examination, that plaintiff was well-groomed, oriented x 3, with a good memory and appropriate affect, and with "+" insight and knowledge. (R. 193). The psychiatrist diagnosed "Anxiety disorder NOS" and history of polysubstance abuse." He also noted that plaintiff was positive for Hepatitis C and had a history of a closed head injury due to "MVA." (R. 193). He prescribed Celexa, and recommended follow-up in four to six weeks. The next treatment note from the psychiatry clinic is dated ten months later – June 4, 2002 – when plaintiff was evaluated by Dr. Michael Ekern.[7] Dr. Ekern noted that plaintiff had been prescribed Celexa several months previously for "depression/anxiety symptomatology" but had stopped taking the medication because of sexual side effects. He wrote:

> His only medication has been Trazodone. He is hepatitis C positive, and apparently has a history of depression. There is a history of head injury with loss of consciousness. He is on Social Security disability, and he says this is for depression. He likes to fish, watch television, ride around with friends. He lives with a girlfriend. He does vaguely describe a persistent, depressed mood every day; however, appetite is good. There is no crying, no suicidal thoughts,

---

[6] Two weeks earlier, plaintiff sought treatment at the clinic after he had screened positive for hepatitis C. He then "denied IV drug use." (R. 194). When plaintiff reported to the clinic for follow-up of his hepatis testing a week after he saw the psychiatrist, he again "denie[d] IV drugs." (R. 189). However, when plaintiff was treated in the gastroenterology clinic in November 2001, the physician wrote that plaintiff had "confirmed hepatitis C in the setting of prior IV drug use." The doctor noted that prior to treating plaintiff with interferon, he "would need psychiatric consultation because of the history of depression." (R. 188; see also R. 187, April 30, 2002 note (same)).

[7] On August 17, 2001, when plaintiff returned to the clinic for follow-up of his hepatitis lab tests, he complained of anxiety and insomnia. The physician diagnosed "Hep C +" and "sleep disturbance" and prescribed Trazodone. (R. 189-90).

> no other symptoms of depression, perhaps, except decreased sleep, but he also states that he is a worrying person and worries about everything. Also, he describes some symptoms which may be anxious and obsessional vs. psychotic vs. reasonable, given his history of being around violence in the past. Occasionally, he thinks he hears someone calling his name and turns, and no one is there. He says he has a fear that someone is behind him and might harm him, so he turns to check. No other possible psychotic symptomatology. It is difficult to characterize these symptoms as being either psychotic or anxious.

(R. 184). Under "Mental Status Examination," Dr. Ekern observed, "Casually dressed, average grooming, pleasant, relates to me well, good eye contact. Thought form coherent, no abnormal movements, no suicidal thoughts, homicidal thoughts, or psychosis. He had some vague depression symptoms and worry symptoms, as noted above. Rule out psychotic symptoms, as noted above. Mood was somewhat depressed. Affect did not appear depressed. He appeared to have some reasonable insight and judgment. No evidence of cognitive problem on routine interview." (R. 184). Dr. Ekern diagnosed "Anxiety disorder, not otherwise specified (NOS). Also depression NOS. History of polysubstance dependence and rule out primary psychotic disorder in this individual with hepatitis C." (R. 184). Dr. Ekern concluded:

> He wants to avoid sexual side effects in medication, and does want treatment for anxiety and vague depression symptoms and worry, so we will begin titration of Serzone 50 mg twice a day for four days, then 100 mg twice a day for a week, then 150 mg twice a day, and he can take one dose at night and one at supper time or earlier in the day. I stated to him that he may not need the trazodone, so he should try and sleep without the trazodone. We will see him back in three to four weeks, and continue to assess for anxious, depressive, and possibly psychotic symptoms.

(R. 184). There is no indication in the record that plaintiff returned to the Psychiatry Clinic

at Hennepin County Medical Center for further treatment at any time. (See Exhibits 3F, 9F).[8]

In December 2005, non-examining psychologist Dr. R. Owen Nelsen reviewed the record in connection with plaintiff's current application. This time, however, Dr. Nelsen found that plaintiff had "No Medically Determinable Impairment" due to "Insufficient Evidence," based on plaintiff's failure to respond to requests for information. (Exhibit 4F, R. 204-17). Accordingly, on December 9, 2005, plaintiff's SSI application was denied. (R. 63, 85-89). On January 26, 2006, plaintiff requested reconsideration of the decision. He wrote, "I am disable I can not stand to be around people because my health is bad and I can not perform on a job because of my mental condition." (R. 84).

The Commissioner sent plaintiff to Karl Kirkland, Ph.D., a clinical psychologist at UAB School of Medicine, for a consultative psychological evaluation on April 24, 2006.[9] Plaintiff stated that he was "on disability, but his payments got interrupted because he went to prison," and that he was applying for disability because of medical problems, including a cracked skull, back problems and chronic liver problems. Dr. Kirkland wrote:

> Mr. Watkins reports that he went to prison because he shot at the police. When asked why he shot at the police, he indicates that he does not know why he shot at the police. A little further questioning revealed that he was involved in a robbery one and assault one, both of which are class A felonies. It was immediately obvious that Mr. Watkins knew a lot more than he was letting on at this point.

---

[8] Plaintiff returned to the Hennepin County Medical Center for treatment of an upper respiratory infection on January 3, 2004 (R. 249-53) and for treatment of back pain after he slipped on the ice and of pain and burning with urination (R. 246-48).

[9] At this time, responsibility for administrative processing of plaintiff's claim had been transferred to from Minnesota to Alabama. (See R. 61, 218).

(R. 219). Dr. Kirkland set forth plaintiff's school history, including multiple failures, multiple behavioral problems and dropping out of school in junior high school. Dr. Kirkland continued:

> After dropping out of school, Mr. Watkins indicates that he tried to sell parched peanuts on the streets of Montgomery and failed. He then started "being bad." As the evaluation progressed, it became apparent that he went on to develop what appears to be a well-developed antisocial personality disorder. This was preceded by major conduct disorders in childhood and adolescence. He has been charged with multiple counts of assault and battery. His most serious crime has been armed robbery. He reports that alcohol was never a major problem, but he reports long-term abuse of marijuana and cocaine. He also reports that he has used cocaine intravenously.

> There was a major pattern present. Mr. Watkins would initially act naive and evidenced a major tendency to minimize problems in any given area. He presented himself as rather naive and innocent. However, when his answers really did not match his history and further questioning occurred, it would be revealed that in fact he had the complete history available to him and the history was horrendous with regard to criminal background primarily. He does meet diagnostic criteria for an antisocial personality disorder. This is often term[ed] psychopathy. This involves an individual who is impaired in their ability to empathize and deform social relations with others.

> *     *     *     *     *

> Robert Watkins has never held a job. He has never worked either in prison or since he has been out of prison. He indicates that he moved up to Minnesota to get out of the jurisdiction of most of his legal problems and lived up there about five years. He tried to work there and even took some medication during that time, but every time he tried to work they would tell him that he could not focus or that he is not willing to work. He describes himself as being lazy and undisciplined. He indicates that while in Minnesota he took Celexa and Trazodone, but does not feel that these medicines really helped him any. He has always wondered [whether] he might have attention deficit disorder.

> While there is some overlap here, it does not sound like attention deficit disorder as much as it sounds like characterological disturbance and a lack of self-discipline.

9

(R. 220-21).  Plaintiff reported that he stays in most of the time, because he fears that

someone will hurt him or that he will hurt others, and because he begins to feel depressed,

paranoid and panicky whenever he goes out in public.  Dr. Kirkland noted, however, that

"[c]ontrary to the above characterization when asked about dating, Mr. Watkins could not

resist the opportunity to brag a little bit. When discussing this area, the examiner had the

impression that he goes out a lot more than he is willing to acknowledge. He did

acknowledge dating some.  He is sexually active and has no sexual dysfunction."  (R. 221).

Plaintiff "did not volunteer any significant psychotic symptomatology" but, when asked

specifically, indicated that he hears a voice calling his name.  Dr. Kirkland noted that "the

auditory hallucinations appeared to be very benign if they are real."  (R. 221).  Dr. Kirkland

concluded:

> There did appear to be an element of some malingering present.  He seems to
> be over reporting symptoms in a major way. In addition, he missed some
> common, easy to answer items included by most examiners to explore the
> possibility of malingering.  For example, he stated that the shape of a ball is
> square and the US flag is blue, red, and yellow. These responses are almost
> always pathognomonic signs of malingering.  When confronted about this, he
> appears to be able to give more complete answers.

(R. 222).  Dr. Kirkland stated that plaintiff "does appear to have some legitimate symptoms,

namely the anxiety symptoms as reported above, it also appears that he is malingering."  Dr.

Kirkland noted that plaintiff's "thought process was generally coherent and goal directed,"

and "his speech was normal."  He stated, "He was pleasant and appears to have good social

skills, which would also be consistent with the antisocial personality disorder.  This examiner

feels that this is the most explanatory diagnosis for Mr. Watkins.  He indicates that he

suffered from a cracked skull at some point. This examiner did not have those records. He also reports physical problems of having back problems. He tended to over dramatize the level of impairment.  At other times, he reported that he goes out on a regular basis. He does appear to be capable of managing financial benefits." (R. 222). Dr. Kirkland's Axis I diagnoses included "History of panic attacks rule out panic disorder," "anxiety attacks rule out panic disorder," "Polysubstance dependence," and "Malingering." On Axis II, he diagnosed, "Rule out antisocial personality disorder."  (R. 223).

The day after he saw Dr. Kirkland, plaintiff reported to Dr. Myrtle Goore for a consultative physical examination.  (Exhibit 6F, R. 224-29).  Plaintiff told Dr. Goore that he was on disability for his depression and mental disease while he was in Minnesota.  He stated that "primarily he is unable to tolerate crowds or to be in any situation where there are more than 2-3 people because he becomes argumentative, or he becomes very irritated.  (R. 224). He indicated that he "rakes the yard occasionally, but he mostly just sits around all day.  He does not have any outside interests. He does not go to church.  He does not belong to any clubs or groups.  He does not go hunting or fishing." (R. 225).  Plaintiff reported that he was incarcerated for seven years "because he was accused of shooting at the police," that he drinks alcohol frequently and that, while he did use intravenous drugs, he no longer does so. Dr. Goore noted no abnormalities in plaintiff's physical examination. She diagnosed "Depression and mental lapses," and "Hepatitis C."  (R. 228).

Dr. Aileen McAlister, a non-examining agency psychiatrist, completed a PRTF on May 10, 2006. (Exhibit 7F). She noted Dr. Kirkland's mental status observations and his

11

conclusion that plaintiff was malingering.  Dr. McAlister concluded that "[d]ue to inability to obtain a valid [medical source examination] to evaluate current severity, claim is rated "insufficient evidence."  (R. 242).  Accordingly, on May 15, 2006, plaintiff's request for reconsideration was denied.  (R. 61, 81-82).  In August 2006, plaintiff retained counsel and requested a hearing before an ALJ.  (R. 58-60).

On September 26, 2007, plaintiff appeared at Montgomery Area Mental Health Authority ("MAMHA"), seeking treatment. He reported symptoms of psychosis, hallucinations, anxiety and depression, and a "long history of mental illness which he recalled as far back as 1970s following a skull injury. He stated that he had received outpatient services while living in Minnesota, and that he wanted to resume mental health treatment with MAMHA. (R. 261).  Plaintiff reported that it was "difficult to be in social setting to work."  (R. 264).  For "[c]hanges client would like to make in living situation," the therapist wrote, "wants own place." For "[c]hanges client would like to make in family/social relationships, she wrote "none," and for "[c]hanges client would like to make in work situation, she noted, "does not want to work."(R. 265).  She noted his legal history to include convictions for attempted murder of a police officer, robbery and assault. (Id.).  The therapist recommended monthly individual therapy and medication evaluation as needed.  (R. 262). A nurse practitioner reviewed the record on October 18, 2007 and diagnosed "Schizophrenia, Paranoid-type by [history]."  (R. 259).

However, a psychiatrist who evaluated plaintiff the following day, diagnosed "major depression, recurrent, with [illegible]."  The psychiatrist observed that plaintiff's mood was

stable, and that he was "alert, rational [and] coherent." He prescribed Risperidone, Trazodone, and Effexor. (R. 258). Plaintiff had an individual therapy session that same day and another session on November 1, 2007. (R. 256-57). Although plaintiff was scheduled to return in two weeks, on November 14, 2007 (R. 256), the next therapy session of record took place on January 24, 2008. At that time, the therapist noted plaintiff's complaint of hearing things and thoughts of someone wanting to kill him or him wanting to kill someone. Plaintiff told his therapist he had "[n]o meds in past week[.]" The therapist "[e]ncouraged [him] to start meds as Rxd ASAP" and to continue with supportive counseling. (R. 255). There are no further treatment notes from MAMHA in the administrative transcript.[10]

On February 14, 2008, plaintiff went to Vonceil C. Smith, Ph.D., for another consultative psychological evaluation. (Exhibit 11F). Plaintiff responded "I don't know" frequently to questions from Dr. Smith. Plaintiff reported "a skull fracture after falling from a truck as a young child, experiencing an unspecified loss of consciousness." Plaintiff was "guarded and evasive" in giving his substance abuse history. He told Dr. Smith that he had

---

[10]   At the June 17, 2009, administrative hearing, plaintiff testified that he had last been to Montgomery Area Mental Health on May 28th, and he showed the ALJ a prescription from MAHMA bearing a date of May 28th which plaintiff had not yet filled. Plaintiff testified that he did not remember his most recent appointment before May. By letter dated January 8, 2009, the medical records clerk at MAMHA – in response to a December 23, 2008 request from the DDS disability examiner for "[m]edical records from 1/2008 TO PRESENT" – provided only a copy of the January 24, 2008, record of individual therapy. (R. 274A-279). Thus, there is no evidence that plaintiff was treated at MAMHA during the sixteen month period between January 2008 and May 2009. The court notes that the prescription plaintiff produced at the hearing was admitted into evidence by the ALJ but is not included in the administrative transcript. However, Dr. McKeown testified that the prescription "would reflect an individual with a bipolar disorder." (R. 307, 310-13). Because the evidence is described adequately in the hearing transcript, the Commissioner's failure to include a copy of it in the administrative record filed with the court is harmless; it does not affect this court's ability to review the Commissioner's decision.

"about three" children, but he did not know their ages. He stated that he completed sixth

grade, but did not know whether he had repeated any grades. Plaintiff further provided a

history of "approximately ten arrests for attempted murder and armed robbery," but he

"fail[ed] to specify further other than he has served three prison sentences." He claimed not

to remember discharging a firearm at police, although he reported that his conviction for

attempted murder stemmed from that event. Dr. Smith observed, on mental status

examination that:

> Mr. Watkins was unkempt and malodorous. He appeared older than his stated
> chronological age. He was alert and oriented to person and partially to place.
> His demeanor was guarded, distant, and terse. His speech was undertalkative.
> His stream of thought was slow. He reportedly hears voices, male in nature,
> calling his name "all the time," but especially at night, as well as sees
> peripheral shadows. His mood was described as irritable, and he appeared
> angry with constricted affect. He reported suicidal thoughts without intention,
> plan, or history of attempts. Homicidal ideations were denied. He failed to
> identify psychosocial stressors.

(R. 270). Dr. Smith administered the WAIS-III. Plaintiff's IQ scores were 56 (Verbal), 51

(Performance) and 49 (Full Scale). Dr. Smith stated that plaintiff demonstrated poor effort

on the WAIS-III and, accordingly, that his IQ scores were invalid and are an

underrepresentation of his intellectual functioning; she further stated that he was

"inappropriate" for the MMPI. Dr. Smith concluded:

> Based on the findings of this evaluation, Mr. Watkins appears **markedly
> impaired** in his ability to understand, remember, and carry out instructions and
> to respond appropriately to supervision, co-workers, and work pressures in a
> work setting.

(R. 271). Dr. Smith completed a "Medical Source Opinion Form (Mental)" on which she

indicated that plaintiff is markedly limited in a number of work functions and extremely limited in his ability to maintain social functioning.  She further concluded that he could not manage benefits in his own best interest.  (R. 273-74).

On November 21, 2008, plaintiff reported to Dr. Alan Babb for a consultative examination.  Dr. Babb stated that plaintiff was "completely uncooperative during the exam," and he noted plaintiff's "intoxicated affect."  He reported that, after every question, plaintiff "shrugged his shoulders and said, 'I don't know.'"  Dr. Babb wrote, under "Review of Systems," that "Patient is unable to provide any useful information and answers 'I don't know' to every question."  He further noted that "[t]hroughout the interview and examination today every time I touched him he pulled back, winced and said he hurt all over. This appears to be obvious deception. When I tried to examine his abdomen he kept wincing up and tightening up and refused to cooperate. . . . When I asked him to grab my hand he made very little effort and just weakly grabbed at them."  (R. 281-82).  With regard to the neurologic exam, Dr. Babb wrote:

> He refuses to answer any questions and his mental status cannot be determined at this time.  He says he does not know the date but does know that his name is Lee.  He makes great effort to look as dysfunctional as possible.  During the earlier part of the interview he was able to kind of give me some pieces of information on the side, but when I went back and asked him those same questions again he shrugged his shoulders and again stated that he "didn't know" which is obvious malingering and deception.  However, because of his past history of a closed head trauma I do not know what his baseline intellectual function and behavior is. Again, he has poor effort on grip strength and refuses to lift his legs. He is able to ambulate without any assist[ive] devices. He has a very flat affect and later when he mentioned about having taken Lortab I couldn't help but wonder if he is under the influence of Rx

drugs.[11]

(R. 282-83).  Dr. Babb wrote that the "[n]eurologic findings show very poor intellect" but

that the "patient is very uncooperative" and "[i]ntellectual skills, again, cannot be determined

at this time."  Dr. Babb's impressions were (1) history of closed head trauma with unknown

neurologic sequela, (2) willful malingering, (3) chronic alcohol and drug abuse by history,

(4) elevated blood pressure, (5) history of elevated liver function tests, (6) history of

antisocial behavior with a history of al ong prison sentence for attempted murder, and

(7) prescription drug abuse.  Dr. Babb concluded:

> It is difficult to make a final assessment on this patient.  I do not know him or
> what his baseline is.  He appears to be able to function "on the street" but here
> today shows willful malingering and is uncooperative.  He seems to go to great
> lengths to appear to be as "retarded" as possible. . . . [I]t is alarming that he is
> taking Lortab on his own.  I also believe strongly that he is using illegal drugs
> and urine drug screens need to be performed on him on a regular basis.

>                          *   *   *   *   *

> He appears to have numerous emotional, psychiatric and physical issues that
> would make long-term employment very difficult.  However, I believe there
> is an overwhelming element of malingering and deception today. I also suspect
> there is extensive use of illegal drugs and prescription drug abuse.

(R. 284). Dr. Babb concluded that plaintiff could not manage benefits in his own best

interest. (R. 287).  Dr. Babb completed a "Medical Source Statement of Ability to Do Work-

Related Activities (Mental)."  Dr. Babb concluded that plaintiff's "ability to understand,

remember and carry out instructions" is *not* affected by plaintiff's impairment, yet he marked

blocks to indicate that plaintiff has marked and extreme limitations in this area, due to his

---

[11]  Dr. Babb noted that plaintiff has no prescription for Lortab.  (R. 280).

history of drug and alcohol abuse, history of closed head trauma, history of malingering, and his antisocial disorder. (R. 290). Dr. Babb marked "No" to indicate that plaintiff's "ability to interact appropriately with supervisors, co-workers, and the public, as well as to respond to changes in the work setting" is *not* affected by his impairment but, again, he checked blocks indicating that plaintiff has "marked" limitations in specific functions in this area. (R. 290). Dr. Babb wrote, "I do not know his baseline. He seems very retarded here today. He may be malingering. He has [history of] closed head trauma." (Id.) When asked to identify the factors that support his assessment of plaintiff's functional limitations, Dr. Babb responded, "very uncooperative here today." (Id.). Dr. Babb expressed his opinion that plaintiff's limitations "started [with] head injury 20 years ago by [history]." (Id.).

At the administrative hearing, when the ALJ asked plaintiff about his physical limitations, plaintiff responded, "They say my liver messed up, I don't know. And my arms, shoulders, arthritis, all because of that. I know there's pain, it hurt up in them all cause here." He stated that it hurts in his left shoulder and liver, and his hip is bruised and still hurts from when he fell off of the truck in 1970. He stated that his head feels terrible, it hurts, and he felt "like just running into that wall." (R. 308-09). On questioning from his representative, plaintiff stated that he has no income to go and check on his hip, that he has severe headaches and shoulder pain. He stated that these problems have kept him from getting and keeping employment and that "some of the men" said that he could not pay attention and could not function. (R. 309).

Dr. Doug McKeown, a clinical and forensic psychologist, testified as a medical

expert.  With regard to plaintiff's head trauma, he stated that there is no information in the record indicating that "there was any sequella or continuing difficulty associated with that." Dr. McKeown noted the mental evaluation by Dr. Barron in June 2000 and testified that "there is some questions as to the authenticity of those particular scores at that time" and that Dr. Barron's conclusions were inconsistent with the record as a whole.  He stated that the evidence is insufficient to establish that plaintiff meets Listing 12.02 because there is nothing "that even establishes information related to [the head] injury" and there is "really nothing that indicates any significant difficulties or limitations as a result of that [injury]."

Dr. McKeown stated that Dr. Smith's primary diagnosis of malingering in the consultative psychological examination conflicted with her RFC form indicating significant limitations and difficulties for the plaintiff; he stated that those RFC conclusions would "make some sense" only if Dr. Smith's evaluation were based on plaintiff's report. Dr. McKeown reiterated, however, that the degree of dysfunction Dr. Smith indicated in the RFC is inconsistent with her clinical impression of malingering.  Dr. McKeown noted that plaintiff had only five visits over a three year period at MAMHA and that there is nothing in the record to substantiate "that there's been any regular ongoing medication provided." He stated that the prescription provided by plaintiff at the hearing "would reflect an individual with bipolar disorder."  He stated that MAMHA had "looked at ... basically what would be considered a bipolar disorder based on at least the medications that have been prescribed but we do not know whether that's ever been implemented really."  Dr. McKeown stated that there is nothing in the record that "spells out issues associated with polysubstance

18

dependency" at the current time and, that there is nothing that, in his opinion, establishes

mental retardation.  Dr. McKeown referred to plaintiff's history of non-compliance and the

consultative examiners' opinions that plaintiff was malingering, and concluded that plaintiff

has no more than mild to moderate limitations, except that he is markedly limited in functions

related to complex tasks. Dr. McKeown completed a mental RFC form, based on his

assessment of the record, including the consultative evaluations; the ALJ admitted the form

as an exhibit. Dr. McKeown noted the MAMHA record indicating that plaintiff was

noncompliant with his medications and his failure to go for treatment. (R. 292-94; 310-17).

## DISCUSSION

The Appeals Council granted review because it concluded that the ALJ "did not

address the examining source opinions of Dr. Barron (Exhibit 1F) and Dr. Smith (Exhibit

11F) pursuant to 20 C.F.R. 416.927."  (R. 10).  The Appeals Council reasoned:

> Dr. Barron provided a consultative psychological evaluation on June 27, 2000
> at which time he did not feel the claimant would be capable of performing the
> required mental functions of even unskilled work (Exhibit 1F). Dr. Smith
> provided a consultative psychological evaluation on February 14, 2008 and
> completed an assessment form which reflected significant work-related mental
> limitations that, if accepted, would preclude the performance of even unskilled
> work (Exhibit 11F). The Appeals Council concludes that these opinions are
> entitled to little weight.
>
> The Appeals Council first notes that Dr. Barron's diagnostic impressions were
> described as either provisional or based on the claimant's reported history,
> which suggests a lack of objective support. Dr. Smith reported that the
> claimant did not give his best effort during the evaluation, which obviously
> renders this opinion less persuasive. This is consistent with the claimant's
> behavior during Dr. Babb's examination provided on November 21, 2008, at
> which time he willfully malingered and displayed uncooperative behavior,
> antisocial behavior, and medical noncompliance (Exhibit 13F). For these

reasons, the Council assigns little weight to the examining source opinions of
Dr. Barron and Dr. Smith.

(R. 10-11).  The Appeals Council "adopt[ed] the findings of the Administrative Law Judge

with the exception that little weight is assigned to the examining source opinions of Dr.

Barron and Dr. Smith."  (R. 11).

Plaintiff notes that "the medical opinions expressed by Drs. Barron and Smith are the

only opinions of record from **examining mental health professionals** regarding the

limitations imposed by Mr. Watkins's mental impairments."  (Doc. # 10, p. 5)(emphases in

original).  Plaintiff contends – in an argument relegated to a footnote at the conclusion of his

brief – that the Appeals Council's "stated three reasons for rejecting the medical opinions

provided by examining mental health professionals of record not only lack sound rationale

reasoning, they approach upon improperly playing both judge and physician" in violation of

Eleventh Circuit precedent.  (Id., p. 6 n. 6).

The opinion of a consultative examiner is not entitled to the deference accorded under

the law to the opinions of treating physicians. McSwain v. Bowen, 814 F.2d 617, 619 (11th

Cir. 1987)(opinions of two physicians were "not entitled to deference because as one-time

examiners they were not treating physicians").  Generally, the opinions of examining

physicians are given more weight than those of non-examining physicians.  See 20 C.F.R.

§ 404.1527(d)(1).  However, the Commissioner "may reject the opinion of any physician

when the evidence supports a contrary conclusion." Carson v. Commissioner of Social Sec.,

373 Fed. Appx. 986, 988 (11th Cir. Apr. 20, 2010)(citing Sryock v. Heckler, 764 F.2d 834,

20

835 (11th Cir. 1985)).

There is no evidence of record – other than plaintiff's own report and the report of his "significant other" that plaintiff's mother had confirmed it – that plaintiff actually had a head injury. Dr. Barron's diagnosis of "dementia due to head injury" is qualified explicitly as "by report." (R. 170). He also rendered a "*Provisional* Diagnosis of Schizophrenia, Paranoid Type." (Id.). The Appeals Council's observation that "Dr. Barron's diagnostic impressions were described as either provisional or based on the claimant's reported history" is, accordingly, supported Dr. Barron's own report; the Appeals Council's conclusion that these provisional and "by report" diagnoses "suggest[] a lack of objective support" is both reasonable and supported by the expert testimony of Dr. McKeown. In assigning "little weight" to Dr. Smith's functional assessment, the Appeals Council noted Dr. Smith's own report that plaintiff did not give his best effort during the examination, and reasoned that this rendered her conclusions of disabling functional limitations less persuasive. The Appeals Council further cited Dr. Babb's observations of plaintiff's willful malingering and refusal to cooperate during Dr. Babb's consultative examination and plaintiff's history of malingering. These reasons are also supported by substantial evidence and provide ample cause for assigning little weight to Dr. Smith's opinion of disabling functional limitations.

Before the Appeals Council, plaintiff argued that the ALJ had "erred by failing to discredit the medical opinions expressed by Drs. Barron and Smith." (R. 16). In this court, plaintiff argues, in a single sentence in a footnote, that "even Dr. Babb expressed that Mr. Watkins lacked the ability to perform the basic mental demands required of work activity."

(Doc. # 10, p. 6 n. 6).   To the extent that plaintiff intends this sentence to express a contention that the Commissioner erred in his treatment of Dr. Babb's RFC opinion, the court rejects the argument. Dr. Babb's RFC opinion, as set forth above, also indicates – contrary to his findings of marked and extreme limitations in specified functions – that plaintiff's limitations do *not* affect his ability to understand, carry out and remember instructions; his ability to interact appropriately with supervisors, co-workers and the public; or his ability to respond to changes in the work environment.  (R. 290-91).  Dr. Babb further indicated, on the RFC form, his opinion that plaintiff may be malingering.  (R. 291).  He observed in his narrative report that "[i]t is difficult to make a final assessment on this patient" and that plaintiff was willfully malingering and being uncooperative during the examination."  (R. 284).   While the ALJ did not explicitly state the weight he assigned to Dr. Babb's RFC responses regarding marked and extreme functional limitations, the ALJ cited Dr. Babb's conclusions of malingering, obvious deception and lack of cooperation, Dr. Babb's stated inability to assess plaintiff's current mental status, and Dr. Babb's observation that it was difficult to make a final assessment on the plaintiff.  (R. 34, 35, 38).  The ALJ's decision – adopted by the Appeals Council – makes clear that he concluded that plaintiff's willful malingering during the consultative examinations rendered the opinions of disabling functional limitations to be entitled to little weight.

Plaintiff acknowledges that "like the ALJ, the Appeals Council does not have to accept [examining source] medical opinions" but argues that "the Commissioner's decision must nonetheless be supported by substantial evidence."  (Doc. # 10, pp. 5-6).  Plaintiff

points to Eleventh Circuit case law for the proposition that "the opinion of a non-examining reviewing physician is entitled to little weight and, taken alone, does not constitute substantial evidence to support an administrative decision." He then argues, "As the only medical opinions of record from <u>examining</u> mental health professionals reveal that Mr. Watkins's mental impairments prevent him from performing substantial gainful activity, it goes without saying that the Commissioner's final decision is based upon non-examining opinions of record. As such, the Commissioner's final decision lacks the support of substantial evidence." (<u>Id.</u>, p. 6). In short, plaintiff contends that the Commissioner cannot – without an RFC opinion from an examining source – render an RFC finding supported by substantial evidence. However, because the Appeals Council discounted the mental RFC assessments of the consultative examiners properly, the Appeals Council was entitled to rely on the opinion expressed by the non-examining medical expert. Contrary to plaintiff's argument, the Commissioner's RFC assessment may be supported by substantial evidence, even in the absence of an opinion from an examining medical source about plaintiff's functional capacity. See <u>Green v. Social Security Administration</u>, 223 Fed. Appx. 915, 923 (11th Cir. 2007)(unpublished opinion)(ALJ's RFC assessment supported by substantial evidence where he rejected treating physician's opinion properly and formulated the plaintiff's RFC based on treatment records, without a physical capacities evaluation by any physician).[12] Additionally, it is clear from the ALJ's decision – adopted by the Appeals

_____

[12]  The Eleventh Circuit stated:

Green argues that once the ALJ decided to discredit Dr. Bryant's evaluation, the record

Council – that he did not rely solely on Dr. McKeown's testimony but, also, considered and relied on the diagnoses rendered by treating and consultative examiners, the consistent medical opinions by different examiners of blatant malingering, plaintiff's admission to the MAMHA intake counselor that he did not want to work, and plaintiff's infrequent visits to mental health providers for treatment.  (R. 27-40).

## CONCLUSION

The evidence shows that plaintiff has mental impairments which cause some work-related mental limitations, and the Commissioner included such limitations in his RFC assessment.   The record further demonstrates that the difficulties encountered by the examining and non-examining medical sources,[13] and by the Commissioner, in attempting to identify the actual extent of plaintiff's limitations were due to plaintiff's consistent efforts – at least during the period in which he was seeking to establish his entitlement to benefits[14]

---

lacked substantial evidence to support a finding that she could perform light work. Dr. Bryant's evaluation, however, was the only evidence that Green produced, other than her own testimony, that refuted the conclusion that she could perform light work. Once the ALJ determined that no weight could be placed on Dr. Bryant's opinion of the Green's limitations, the only documentary evidence that remained was the office visit records from Dr. Bryant and Dr. Ross that indicated that she was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication. Thus, substantial evidence supports the ALJ's determination that Green could perform light work.

223 Fed. Appx. at 923.

[13] Plaintiff's treating psychiatrists at MAMHA and Hennepin County Medical Center provided no opinion regarding plaintiff's functional limitations.

[14] The treatment notes for plaintiff's medical treatment in Minnesota, while he was receiving SSI benefits, reveal plaintiff's ability to provide descriptions of his symptoms and history to his treating practitioners and to interact with them on a much higher level than was exhibited during his consultative examinations. (See Exhibit 3F).

– to exaggerate those limitations.  Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and, therefore, that it is due to be affirmed.  A separate judgment will be entered.

DONE, this 15th day of July, 2011.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE